IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

_____

GARRETT LEON GAINES        *

    Plaintiff,        *

    v.        *        2:04-CV-763-MHT-DRB
                                                   (WO)
GWENDOLYN MOSLEY, *et al.*,        *

    Defendants.        *

_____

### RECOMMENDATION OF THE MAGISTRATE JUDGE

On July 28, 2006, this court entered summary judgment for all except one defendant in this 42 U.S.C. § 1983 action filed *pro se* by Garrett Gaines ["Gaines"], then an Alabama prisoner incarcerated at the Easterling Correctional Facility.[1]  The Magistrate Judge conducted an evidentiary hearing on October 31, 2006, on Gaines' "excessive force" claim for monetary damages against that defendant, Correctional Officer Frederick Jones ("Jones"), who is sued in his individual capacity.[2]  After duly considering all relevant

---

[1] Released from incarceration on November 1, 2006, Gaines provided this new address: 784 Jasper Road, Aliceville, Alabama 35442.

[2] As noted in the Magistrate Judge's Recommendation entered June 20, 2006 (Doc. 63), the court directed that Defendants respond to Gaines' complaint, filed August 9, 2004, with a "special report and supporting evidentiary material" and gave notice of its intent to treat the submissions as a *motion for summary judgment*.  Gaines' response disclosed no disputed factual issues which precluded summary judgment for the other defendants: Warden Gwendolyn Mosley and correctional officers Kenneth Jones and Phelix Woods.

testimony and exhibits, against the backdrop of the relevant record,[3] the Magistrate Judge concludes that Jones is also entitled to summary judgment.[4]

## I. EVIDENTIARY FINDINGS

The evidentiary hearing proceeded on a single issue: *whether correctional officer Jones used constitutionally impermissible force against Gaines following a physical altercation between Gaines and another inmate on July 18, 2004, at the Easterling Correctional Facility*. The fact of Gaines' fight with the inmate is undisputed, and the details are irrelevant to the subsequent encounter between Gaines and Jones.[5]

---

[3] *Complaint* (Doc.1, Aug. 9, 2004), as twice amended (Doc. 18, Sept. 2, 2004 and Doc. 23, Sept. 22, 2004); *Special Report* and supporting exhibits (Doc. 31, Oct. 8, 2004); *Answer* (Doc. 30, Oct. 12, 2004); *Response to Answer* to Complaint (Doc. 36, Oct. 21, 2004); *Response to Special Report* (Doc. 37, Oct. 21, 2004).

[4] In order to survive Defendants' properly supported motion for summary judgment, Gaines is required to produce some evidence supporting his constitutional claims. *See Celotex v. Catrett*, 477 U.S. 317, 322 (1986). When a plaintiff fails to make a showing sufficient to establish the existence of an element essential to his case, and on which he will bear the burden of proof at trial, summary judgment is due to be granted in favor of the moving party. *Celotex*, 477 U.S. at 322; *Barnes v. Southwest Forest Indus. Inc.*, 814 F.2d 607 (11th Cir. 1987). Where all the evidentiary materials before the court indicate that there is no genuine issue of material fact and that the party moving for summary judgment is entitled to it as a matter of law, entry of summary judgment is appropriate. *Celotex*, 477 U.S. at 322; *Everett v. Napper*, 833 F.2d 1507, 1510 (11th Cir. 1987).

[5] After an inmate "threw bleach in [his] cell," Gaines summoned a correctional officer and entreated him to open his cell door and "see for yourself there is bleach all in the cell." When the officer opened the door, Gaines "saw the opportunity to get me some 'get back' so we got to fighting." (Tr. 25-26). *See Def's Ex.* 5 ("Officer Peavy opened the door approximately six inches to look inside the cell. Inmate Gaines rushed through the door, and ran toward Inmate Boykins, who was standing beside his assigned cell [ ]. Inmates Gaines and Boykins got into a physical altercation").

As evidentiary support for his claim, Gaines testified, presented testimony from Correctional Officer Lagreta McClain ("McClain") and inmate Christopher Abrams, and had admitted three pages from his medical records and another exhibits (*Pl.'s Exs.* A-D). For his defense, Jones presented testimony from himself, Correctional Officer Phelix Woods ("Woods"), and Assistant Warden Kenneth Jones .

Correctional Officer McClain witnessed "that [Gaines] kicked Officer Jordan and then [ ] tried to head butt him in his chest area ...running at him, trying to hit him in the chest with his head". Gaines was in handcuffs the entire time. McClain "didn't get a chance to assist Officer Jordan [because] he accidentally elbowed [her] in the forehead [while] Gaines [was] kicking [Jordan]". Because she did not have a radio with her to call for help, she "left the scene and went to the healthcare unit." She identified Defendant Jones and Officer Peavy as officers trying to help Officer Jordan restrain Gaines, but she left before observing them in the act of restraint.

From a cell located "on the same side as Gaines' cell, Inmate Abrams testified that "[Defendant Jones] had bragged about how he had jumped on [Gaines] after he had restrained [him]." Asked for particulars, Abrams responded: "After they restrained him, they continued to beat him. And Officer Downey on the third shift came to him and started bragging about how they had jumped on him." Abrams admitted, however, that he did not witness either Gaines' altercation with the inmate or with the officers: "I just overheard

3

Officer Downey saying to him how they had bragged about how they had beat him. . . I didn't witness the beating, but I witnessed that they had dragged him out on the other side of the cell on the B side of the lock-up unit." He also admitted that he did not hear Defendant Jones brag about beating Gaines. (Tr. 20-21).

The court readily concludes that neither witness offered by Gaines presented any credible testimony which established or corroborated his allegations of excessive force. According to his sworn testimony, Gaines obeyed Officer Peavy's command to go back inside his cell after Peavy managed to stop his fight with the other inmate. Apparently in response to a "code", other officers rushed over to his cell and ordered him to "put [his] hands out the door." After hesitating initially, he did, and after handcuffing him, Officer Eddie Jordan and others escorted him to the infirmary. Enroute, Gaines and Officer Jordan had a heated and profane exchange of threats, culminating allegedly with Jordan swinging and hitting him in the face. Contrary to Officer McClain's testimony, Gaines maintains that she witnessed this assault, "dropped her lunch bag and came between [them] as Officer Jordan tried to hit Gaines with his radio". (Tr. 29-30).

When Gaines saw other officers rushing out to assist Officer Jordan, he retreated to the ground, where the alleged assault by Defendant Jones occurred. Gaines' relevant account of the encounter follows:

So when the officers rush out, I laid on down. I am already handcuffed behind

4

> my back. The first officer that gets there, I don't know who he was. All I know is he a white officer; he wasn't no black officer. He tells me to lay down. I tell him I am already laid down. So he puts his knees in my back, and the rest of the officers, they come put their knees in my back. By this time, Officer Jones, Sergeant Woods, Officer Peavey, they're coming out of 5 Block. . . . Officer Jones, he goes to Officer Jordan, all I hear him say, 'I know he didn't.' . . . That is when he [Defendant Officer Jones] came and jumped on my back and started punching me like that (indicating) . . . So he is punching me in my face right here, because I am on the ground with my hands behind my back. So he is punching me in my head. So by this time, Sergeant Woods tells him to stop. So Sergeant Woods is pulling him off of me, but he is steady punching me. So while he is pulling him off of me, he grabbed me in my face like, put his finger in my mouth, like trying to pull my face, like he is just trying to hold onto me. So Sergeant Woods pulled him off. So he grabbed me around my neck and started choking me. So Sergeant Woods tell him, man, let him go, So he finally let me go.

(Tr. 33-34). After pledging "to do an investigation, Sgt. Woods instructed Officers Peavy, Jones, and Dennis to take Gaines to the infirmary.

The "sick call" report completed by the infirmary nurse indicated a "good" condition on admission for Gaines and duly recorded his complaint: "All these scratches the officer did it - not an inmate. They choked me." The nurse recorded as follows her own observations: "Skin warm and sweat. Respiration even and unlabored. Scratch noted to left side of nose. Scratch noted to left shoulder. Scratch noted to left breast. No acute distress noted. Denies any other injuries. No redness noted to neck." After cleansing Gaines' scratches with peroxide, the nurse discharged him in "satisfactory" condition without any prescriptions for

5

medications or further treatment.[6] Gaines disputed the completeness of the nurse's record of his injuries and maintained that he showed her "swelling in [his] face." He testified that continuing head pain and swelling on the right side of his face triggered his return to the infirmary later in the evening; the admitting nurse did note "two small raised areas to left temple of forehead" and prescribed tylenol. (*Pl.'s Ex.* B). A week later, on July 25, Gaines presented to the infirmary, complaining "it's hard to describe how I feel." His vital signs were within normal limits and the nurse noted a "small raised area at his left temple area." (*Pl.'s Ex.* D).[7]

Gaines admitted that he could not attribute to Defendant Jones all of his claimed injuries, explaining: "I know he hit me, but I can't say that him hitting me did all of this damage because I got hit in the same spot by two different people. All I know is that he was the last one to hit me in this area . . . right in my temple" (Tr. 41). He testified with certainty, however, that Defendant Jones "hit him more than four times before [Sgt. Woods] could pull him off"; that he was face down handcuffed on the floor with , subdued by officers

---

[6]*Pl.'s Ex.* C.

[7]Confronted on cross-examination with the contradiction between his testimony of right-side swelling and the medical records' documentation for lumps on the left-side of his temple, Gaines conceded that his memory of the two-year old incident might be faulty: "It is going to be hard to remember. My body chart reflected what happened, right. . . I could have mixed up. That's been so long ago. I have been jumped on twice since then. So I don't know." (Tr. 56). He maintained, however, that the right-handed defendant "struck [him] on the right side of [his] face." (Tr. 57).

with their knees in his back; that he recognized Jones' voice as he was "on [his] back and ...yelling at [him] at the same time." (Tr. 41-43, 46).

Like Correctional Officer McClain, Sgt. Phelix Woods, summoned as a defense witness, provided no corroborative testimony for Gaines' account of his altercation with Defendant Jones. Woods responded first to the call for officer support in the locked-down segregation unit following the fight between the inmates. Woods instructed officers to take Gaines to the infirmary and learned that in transit "Gaines had pulled away from Officer Jordan and kicked him on the leg, and Officer Jones and Officer Peavey had restrained him by placing him on the ground face first." He did witness the "restraint" by Jones and absolutely denied that Jones struck Gaines, grabbed his face, choked him, or otherwise injured him; nor did Woods restrain Jones from any attack on Gaines.[8]

Kenneth Jones, now a Warden at the Donaldson Correctional Facility, held the rank of Warden 2 at Easterling on July 18, 2004 and received from Sgt. Woods initially a telephoned report of the physical assaults involving Gaines. The subsequent investigations he ordered disclosed no use of excessive force by Jones (Tr. 79-80). The defendant himself

---

[8]Tr. 64-66; 74. *See also Def.'s Ex.. 2* (Sgt. Phelix Woods' "Use of Force" investigative statement for interviews of Gaines and inmate Boykins); *Ex..3* (Sgt. Phelix Woods' "Use of Force" investigative statement for interviews of correctional officers Peavy, Jordan, and Jones); *Ex.. 5* (Institutional Incident Report). After interviewing Gaines, Jones, Jordan, and Peavy, Sgt. Wood concluded: "Officer F. Jones and L. Peavy placed inmate Gaines face down on the ground. Officers F. Jones, Jordan and Peavy used the minimal amount of force necessary to stop Inmate Gaines from charging towards Officer Jordan in a threatening manner. No further force was used." (*Def.'s Ex*.3).

7

denied threatening to assault Gaines at any time and offered this recollection of their physical encounter when he and other officers observed Officer Jordan and Gaines entangled physically near the healthcare unit:

> [W]e see Officer Jordan was having some type of problem with Inmate Gaines, as if he is trying to place him on the ground. . . . at this point, we rush out to the scene. Officer Peavy and I, we are running. . . We make it to Inmate Gaines simultaneously. We grabbed Inmate Gaines by his shoulder. I grabbed his . . . right shoulder. My left hand was my weak hand. We take him down to the ground, and he is face down at this time. And we are holding him on the ground, face down. Sgt. Woods comes and he tells us to get him up on his feet. We hold him up on his feet, and then we escorted him to the healthcare unit.

According to Jones, Gaines "was going away from where Officer Jordan was at the time, near the healthcare unit." Jones denied putting his knees in Gaines' back, striking, kicking, or punching him. (Tr. 95-97).

## II.  DISCUSSION

### A.  "Excessive Force" standards

*Skrtich v. Thornton,* 280 F.3d 1295, 1300-1301 (11th Cir. 2002) summarizes, as follows, the constitutional test for excessive force by a custodial officer against an inmate:

> Under the Eighth Amendment, force is deemed legitimate in a custodial setting as long as it is applied "in a good faith effort to maintain or restore discipline [and not] maliciously and sadistically to cause harm." *Whitley v. Albers,* 475 U.S. 312, 320-21, 106 S.Ct. 1078, 89 L.Ed.2d 251 (1986) (quoting *Johnson v. Glick,* 481 F.2d 1028, 1033 (2d Cir.1973)); *see also Hudson v. McMillian,* 503 U.S. 1, 8, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992). To determine if an application of force was applied maliciously

>and sadistically to cause harm, a variety of factors are considered including: "the need for the application of force, the relationship between that need and the amount of force used, the threat reasonably perceived by the responsible officials, and any efforts made to temper the severity of a forceful response." *Hudson,* at 7-8, 112 S.Ct. 995; *see also Whitley,* 475 U.S. at 321, 106 S.Ct. 1078; *Harris v. Chapman,* 97 F.3d 499, 505 (11th Cir.1996). From consideration of such factors, "inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Whitley,* 475 U.S. at 321, 106 S.Ct. 1078 (quoting *Johnson,* 481 F.2d at 1033).

An excessive force claim "necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not a sort 'repugnant to the conscience of mankind.'" *Hudson*, 503 U.S. at 9-10 (quoting *Whitley*, 475 U.S. at 327.) In *Hudson*, the Court did not define "*de minimis* use of force" but suggested that the degree of injury received is at least relevant to determining whether more than *de minimis* force was used. *Id.* at 10.

### B.     Evidentiary Analysis

No evidence – testimonial or documentary – corroborates Gaines' account of the force administered by Defendant Jones, and Gaines' own testimony is far from persuasive on the material facts. He is steadfast in his recollection that Jones struck him repeatedly on the right side of his face but defers to the medical reports for the description of the injuries inflicted; those reports consistently document his complaints, and the nurse's observations, of left-side

pains and swelling. Conceding that he saw only one officer assault him while he was lying face down on the ground, nonetheless he insists that he recognized the defendant's voice as he yelled at him while punching him in the face. He cannot attribute the indisputably minor injuries he claims – "two lumps in his temple [resulting] in persistent headaches" – solely to Defendant Jones.

What is compelling from uncontradicted evidence is that Gaines' physical resistance to Officer Jordan's lawful orders triggered the call for assistance, to which Jones responded. All the relevant witnesses to the altercation between Gaines and Jordan related the need to restrain Gaines from escaping Officer Jordan's custodial supervision – enroute to the health care unit – or from continuing his physical aggression which accompanied his verbally abusive threats.

Notwithstanding the minor injuries sustained, the court must also consider the need for the application of force, the amount of force exerted, the threat reasonably perceived by the official and any efforts to temper the severity of the forceful response. The court does not find credible or corroborated by credible evidence the allegations by Gaines that Defendant Jones, acting wholly without provocation or any lawful purpose, struck him repeatedly with his right fist while kneeing him in the back. Indeed, the records which document his medical care twice on the date of the incident do not refer at all to any signs of injuries to his right forehead or to his back. The officers assisting and/or witnessing Jones

confirm his use of tempered force just sufficient to restrain Gaines, restore him to his feet, and continue his transport to the infirmary.

### III.   CONCLUSION

In sum, the credible evidence supports Defendant Jones' good-faith attempt to restrain Gaines from resisting further Officer Jordan's lawful orders and thereby restore discipline.  Having resolved in Defendant Jones' favor the disputed account of his physical encounter with Gaines, the court readily concludes that the record does not establish any constitutionally impermissible force, and Jones is entitled to judgment as a matter of law.

Accordingly, based on the evidentiary record, it is now the **RECOMMENDATION** *of the Magistrate Judge* that the *motion for summary judgment* filed on behalf of **Defendant Frederick Jones, in his individual capacity (Doc. No. 31), be GRANTED** with respect to Plaintiff's excessive force claim.

It is further

ORDERED that the parties shall file any objections to this Recommendation on or before **December 7, 2006**. Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party is objecting.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and advisements in the Magistrate Judge's Recommendation shall bar the party from a de novo determination by the District Court of issues covered in the Recommendation and shall bar the party from attacking on appeal factual findings in the Recommendation accepted or adopted by the District Court except upon grounds of plain error or manifest injustice. *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982). *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982). *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

**The Clerk is hereby reminded to transmit this Recommendation to the Plaintiff at his free-world address**.

Done this 22nd day of November, 2006.

> **/s/ Delores R. Boyd**
> DELORES R. BOYD
> UNITED STATES MAGISTRATE JUDGE